# 26-1773

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

MARIANO TORRES and LESTER WILSON,

Plaintiffs-Appellants

v.

JAMES CARLSON, AIDAN PARISI, GRANT MINER, CATHERINE CURRAN-GROOME, PEOPLE'S FORUM, INC., LISA FITHIAN, GABRIEL YANCY, ETHAN CHOI, and JOHN DOES 1-40,

Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF APPELLANTS AND URGING REVERSAL

*(See inside cover for continuation of counsel)*

*(Continuation of cover)*

HARMEET K. DHILLON
Assistant Attorney General

JEFFREY G. MORRISON
Deputy Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
AUDREY A. WEAVER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 890-0949

## TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 2

A. Legislative History ........ 2

B. Factual History ........ 3

C. Procedural History ........ 5

SUMMARY OF ARGUMENT ........ 6

ARGUMENT ........ 6

I. The district court erred in holding plaintiffs failed to state a Section 1985(3) conspiracy because the ultimate objective of the conspiracy was political. ........ 7

A. The existence of a political motive or purpose cannot shield a conspiracy that is also motivated by discriminatory animus and purpose. ........ 8

B. A lawful or political objective does not negate an inference of discriminatory animus or purpose where discriminatory means are used to achieve that lawful objective. ........ 17

II. Membership in the targeted class is not a prerequisite for Section 1985(3) liability. ........ 29

CONCLUSION ........ 35

**TABLE OF CONTENTS (continued):**

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES:** **PAGE**

*Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1 (2024) .......... 22

*Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644 (2020) .......... 12

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993) .......... *passim*

*Bush v. Vera*, 517 U.S. 962 (1996) .......... 22

*Cooper v. Harris*, 581 U.S. 285 (2017) .......... 22

*Dawson v. Delaware*, 503 U.S. 159 (1992) .......... 16

*Dean v. United States*, 556 U.S. 568 (2009) .......... 31

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) .......... 11

*Farber v. City of Paterson*, 440 F.3d 131 (3d Cir. 2006) .......... 33

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025) .......... 16, 19, 29

*Gordon v. New York City Bd. of Educ.*, 232 F.3d 111 (2d Cir. 2000) .......... 12

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) .......... 7-10

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) .......... 30

*Hernandez v. Coughlin*, 18 F.3d 133 (2d Cir. 1994) .......... 14

*Holgate v. Baldwin*, 425 F.3d 671 (9th Cir. 2005) .......... 32

**CASES (continued):** **PAGE**

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*,
968 F.2d 286 (2d Cir. 1992) .......... 7

*LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412 (2d Cir. 1995) .......... 19

*Life Ins. Co. of N. Am. v. Reichardt*,
591 F.2d 499 (9th Cir. 1979) .......... 32

*Lounds v. Lincare, Inc.*, 812 F.3d 1208 (10th Cir. 2015) .......... 19

*North Carolina State Conf. of NAACP v. McCrory*,
831 F.3d 204 (4th Cir. 2016) .......... 19

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) .......... 29

*Personnel Adm'r of Massachusetts v. Feeney*,
442 U.S. 256 (1979) .......... 11

*Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379 (2d Cir. 2020) .......... 18

*Ricci v. DeStefano*, 557 U.S. 557 (2009) .......... 20-21

*Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500 (1957) .......... 18-19

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) .......... 24-25

*United Bhd. of Carpenters & Joiners of Am., Loc. 610,*
*AFL-CIO v. Scott*, 463 U.S. 825 (1983) .......... 2, 31-32, 34

*University of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) .......... 12

**CASES (continued):** **PAGE**

*Vega v. Hempstead Union Free Sch. Dist.*,
801 F.3d 72 (2d Cir. 2015) .......... 17-18

*Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997) .......... 18

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 11

*Village of Bellwood v. Dwivedi*, 895 F.2d 1521 (7th Cir. 1990) .......... 21-22

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) .......... 16

**STATUTES:**

Civil Rights Act of 1871 (Third Ku Klux Klan Act)
42 U.S.C. 1985(3) .......... *passim*
ch. 22, 17 Stat. 13 .......... 1

18 U.S.C. 241 .......... 1

42 U.S.C. 1983 .......... 31

42 U.S.C. 1986 .......... 5

**RULE:**

Fed. R. App. P. 29(a) .......... 1

**MISCELLANEOUS:**

Columbia Univ., Press Release,
Statement from Columbia University President Minouche Shafik (Apr. 29, 2024), https://perma.cc/5LB7-AV5R .......... 24-25

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in this appeal, which raises important questions concerning the proper application of Section 2 of the Third Ku Klux Klan Act, 42 U.S.C. 1985(3). The Attorney General has authority to prosecute conspiracies against federally protected rights, 18 U.S.C. 241, and therefore has an interest in the proper scope of Section 1985(3) conspiracy liability. Additionally, the analytical framework for evaluating that liability may have implications for the enforcement of other civil rights statutes, including Titles VI and VII of the Civil Rights Act of 1964.

The United States files this brief under Federal Rule of Appellate Procedure 29(a).

## STATEMENT OF THE ISSUES

The United States addresses only the following questions:

1. Whether the district court erred in holding that plaintiffs failed to state a claim under Section 1985(3) because denial of the equal protection of laws, while a conscious objective of defendants' conspiracy, was not the conspirators' "ultimate goal."

2. Whether the district court erred in holding that people who are "perceived to be Jews or supporters of Jews" are not members of a protected class under Section 1985(3).

## STATEMENT OF THE CASE

### A. Legislative History

Following the ratification of the Reconstruction Amendments at the conclusion of the Civil War, Congress enacted the Civil Rights Act of 1871, also known as the Third Ku Klux Klan Act (Act), ch. 22, 17 Stat. 13. The Act was passed to respond to campaigns of intimidation, assault, and murder by groups like the Ku Klux Klan targeting black Americans and their political allies. The "central theme of the bill's proponents was that the Klan and others were forcibly resisting efforts to emancipate [black Americans] and give them equal access to political power." *United Bhd. of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983).

The surviving version of Section 2 of the Act prohibits "two or more persons" from "conspir[ing] or go[ing] in disguise on the . . . premises of another, for the purpose of depriving . . . any person or class of persons of

the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. 1985(3).

### B. Factual History

The October 7, 2023, attack on Israel launched by the federally designated terrorist organization known as Hamas has been described as "the deadliest day for world Jewry since the Holocaust[,]" precipitated a wave of protests, demonstrations, and political activities on college campuses across the United States. JA.17-19. In the following months, Columbia University saw a pattern of "unauthorized protests," "threatening rhetoric and intimidation," and "harassment and violence against Jews" centered around the Israel-Gaza conflict. JA.20. Protestors would feature "hateful anti-Semitic messages like 'Death to Jews!' and 'Fuck the Jews[.]'" JA.20. "Jewish students and other Jewish members of the Columbia community were frequent targets of harassment and assaults." JA.22.

By April 2024, the ongoing campaign of disruptive conduct culminated in a "Gaza Solidarity Encampment" — "a hotbed of virulent anti-Semitism" where Jewish students were "barred from entry, physically assaulted, and subject to calls of 'Yahoodim, yahoodi [Jews,

Jew], fuck you,' 'stop killing children,' 'go back to Poland,' 'Nazi bitches,' and 'go to a synagogue.'" JA.9-10. On April 29, Columbia's president warned that "[t]he current unauthorized encampment and disruption on Columbia University's campus is creating an unwelcoming environment for members of our community[,]" and announced disciplinary proceedings would follow if the encampment was not removed and its participants did not voluntarily disperse. JA.32-35; *see also* JA.10, 22. The next day, "instead of voluntarily dispersing[,]" "hundreds of pro-Hamas demonstrators picketed through Columbia's campus" and defendant conspirators engaged in "a calculated and deliberate escalation of [their] ongoing campaign to 'take[] back' Columbia University's campus from Jews and 'Zionists'" by "violently storm[ing]" and seizing Columbia's Hamilton Hall. JA.8, 11, 35.

Shortly after midnight on April 30, 2024, individual conspirators "donned masks and hoods to conceal their identities, armed themselves with rope, zip ties, and crow bars, and smashed their way through the doors and windows of Columbia University's Hamiton Hall." JA.7. "What was happening in Hamilton Hall appeared to be the result of significant planning and preparation[.]" JA.41-42; *see also* JA.36-39, 43-44. Once

inside, the conspirators confronted two janitors, Mariano Torres and Lester Wilson (plaintiffs), "who were working the overnight shift cleaning the building's classrooms and bathrooms." JA.40-46. When Mr. Torres, who is Latino, and Mr. Wilson, who is black, refused to comply with the conspirators' demands, individual conspirators assaulted and battered them, held the men against their will, and derided them as "Jew-lovers" and "Zionists" who "work for the Jews." JA.7-8; *see also* JA.40-43. As a result of the injuries they sustained, plaintiffs were unable to return to work and were fired by Columbia University. JA.48-49; *see also* JA.13.

### C. Procedural History

Plaintiffs filed this suit against defendants alleging a conspiracy to deprive individuals of equal protection of laws in violation of 42 U.S.C. 1985(3) and 42 U.S.C. 1986. JA.49-56. Defendants moved to dismiss, primarily arguing that plaintiffs failed to state a viable claim under the Act because plaintiffs are not a member of a protected class and that defendants engaged in pure political speech that could not constitute racial animus. *See, e.g.*, Doc. 36-1, at 13-14, 18-19.

On June 1, 2026, the district court entered its Memorandum Opinion granting defendants' motion to dismiss the Klan Act claims with

prejudice. JA.71-72. The court ultimately concluded "Plaintiffs fail to plausibly allege the existence of a conspiracy for the purpose of depriving the Plaintiffs of the equal protection of the laws." JA.84. This appeal followed.

## SUMMARY OF ARGUMENT

In dismissing plaintiffs' conspiracy claim under 42 U.S.C. 1985(3), the district court erred in at least two significant ways. First, the district court erred in treating the existence of a political objective underlying the conspiracy as dispositive. The district court never meaningfully considered whether the Complaint sufficiently alleged a second motive and purpose. Second, the district court erred in concluding Section 1985(3) limits recovery to injured parties who prove membership in the class targeted by the conspiracy. The plain language of Section 1985(3) forecloses this extra-textual class membership requirement.

## ARGUMENT

The Act creates a private right of action for individuals "injured" or "deprived of having and exercising any right or privilege of a citizen of the United States" by "any act in furtherance of the object of" a conspiracy to "depriv[e], either directly or indirectly, any person or class of persons

of the equal protection of laws[.]" 42 U.S.C. 1985(3). To establish a Section 1985(3) conspiracy, plaintiffs must allege "(1) that 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action,' and (2) that the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment[.]'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993) (brackets in original; citations omitted); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102-103 (1971). It is undisputed that the "class-based animus" requirement of Section 1985(3) encompasses discrimination based on being Jewish. *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 291 (2d Cir. 1992).

In dismissing the plaintiffs' Section 1985(3) conspiracy claim, the district court made two principal errors that bear particular emphasis.

## I. The district court erred in holding plaintiffs failed to state a Section 1985(3) conspiracy because the ultimate objective of the conspiracy was political.

The district court erred in treating defendants' asserted political objective as dispositive, effectively concluding that the conspiracy could not have been motivated by discriminatory animus or an invidious purpose because its ultimate objective was political. *See* JA.86-88. In

minimizing defendants' conduct as "pure political speech," "ugly statements," and mere "despicable political behavior" (JA.94, 98, 103), the district court failed to adequately engage with the totality of the Complaint and ignored the prevalence and necessity of indirect evidence in discrimination cases. The existence of a political objective does not negate a separately pleaded discriminatory purpose, nor does it preclude a claim based on discriminatory means used to pursue a non-discriminatory purpose.

### A. The existence of a political motive or purpose cannot shield a conspiracy that is also motivated by discriminatory animus and purpose.

The existence of one non-discriminatory purpose or motive behind a conspiracy does not disprove the existence of invidiously discriminatory animus or a separate purpose to deprive someone of a right under Section 1985(3).

1. In *Griffin v. Breckenridge*, 403 U.S. 88 (1971), the Supreme Court examined Section 1985(3)'s motivation requirement and held that "intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action[,]" and

restated this as requiring the conspiracy "aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Id.* at 102. The Court further explained the motivation requirement "focuses not on scienter in relation to deprivation of rights but on invidiously discriminatory animus." *Id.* at 102 n.10.

The Supreme Court elaborated further in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993). In that case, involving a group of abortion clinics and pro-abortion organizations (respondents) who sued a pro-life association and individuals (petitioners) organizing anti-abortion demonstrations outside abortion clinics, *id.* at 266, the Court explained that Section 1985(3)'s animus requirement demands "at least a purpose that focuses upon women *by reason of their sex*." *Id.* at 270; *see ibid.* (offering the example of "the purpose of 'saving' women *because they are women* from a combative, aggressive profession such as the practice of law"). And the decisionmaker must act "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* at 272 (citation omitted). The Court drew this principle from its Equal Protection Clause jurisprudence and concluded that it applied equally to Section 1985(3) "because it is inherent in the

requirement of a class-based animus, *i.e.*, an *animus based on class*." *Id.* at 272 n.4.

Along similar lines, the Court made clear that Section 1985(3) "requires an intent to deprive persons of a right guaranteed against private impairment[,]" which means the impairment of a protected right must be "the purpose" of, "aimed at," or "a conscious objective of the enterprise." *Bray*, 506 U.S. at 274-275 (emphasis and citation omitted). Thus, the Court applied the same analysis to both the animus and intent-to-deprive requirements of Section 1985(3): both "require[] that the defendant have taken his action 'at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group[.]'" *Id.* at 275-276 (citation omitted).

In sum, *Griffin*, 403 U.S. at 102 (emphasis added) and *Bray*, 506 U.S. at 268, 272 (emphasis added; citation and internal quotation marks omitted), make clear that establishing a Section 1985(3) conspiracy only requires "*some* racial, or perhaps otherwise class-based, invidiously discriminatory animus" and that the defendants proceeded "*at least in part* because of, not merely in spite of, its adverse effects upon an identifiable group." That necessarily contemplates that more than one

motive and objective can coexist with the requisite discriminatory animus and purpose.

2. This principle has consistently been applied across other analogous civil rights contexts. In Equal Protection cases, a "[d]iscriminatory purpose" may be established because the decisionmakers took "a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Bray*, 506 U.S. at 271-272 (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)); *see also Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (explaining a plaintiff need not "prove that the challenged action rested solely on racially discriminatory purposes"). In fact, "[r]arely can it be said" that a decisionmaker was "motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one." *Village of Arlington Heights*, 429 U.S. at 265.

Similarly, in the Title VII employment discrimination context, a plaintiff need only demonstrate that "race, color, religion, sex, or national origin was *a* motivating factor for any employment practice." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (emphasis added; citation

omitted). Importantly, then, "[i]t suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *University of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013); *accord Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 656 (2020); *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

3. While the district court acknowledged "a conspiracy can, of course, have more than one objective" (JA.88), it failed to meaningfully consider whether the conspiracy pled here had more than one objective. Instead, the district court summarily concluded that "the purpose (and the only purpose) of the alleged conspiracy was, in Plaintiffs' own words, 'to seize and hold Hamilton Hall until such time as Columbia acquiesced to [defendants'] anti-Zionist, anti-Israeli, and anti-Semitic demands.'" JA.86-87 (quoting JA.54, ¶ 168); *see also* JA.87 ("[t]his was unquestionably the purpose – the objective – of the conspirators"); JA.85 ("Occupying Hamilton Hall until the demands were met is alleged to have been the conspirators' stated object."). But those allegations about the

existence of a political purpose do not establish that the political purpose was the *only* purpose of the conspiracy.

The root of the district court's error can likely be attributed to its fixation on the allegation that defendants "conspired and agreed to seize and hold Hamilton Hall until such time as Columbia acquiesced to [their] anti-Zionist, anti-Israeli, and anti-Semitic demands." JA.51; *see also* JA.54 (similar). But the totality of the Complaint tells a much larger story. Plaintiffs alleged that defendants:

❖ waged an "ongoing campaign to 'take[] back' Columbia University's campus from Jews and 'Zionists[,]'" JA.8,

❖ "conspired to prolong and intensify an ongoing campaign to harass, intimidate, terrorize, and deny the civil rights of people who are—or are perceived to be—Jews or supporters of Jews[,]" JA.9,

❖ "were closely involved in planning, supporting, and agreeing to multiple actions taken on Columbia's campus to express anti-Semitic hatred and to intimidate Jewish students and those perceived to be their supporters[,]" JA.9,

❖ "devised a plan to prolong and intensify their campaign of anti-Semitic violence and intimidation at Columbia University[,]" JA.10,

❖ "sought to silence any opposition or criticism, drive those in the Jewish community apart and off campus, restrict their access to places on campus, and deny them safety or a feeling of safety as they attempted to engage in daily activities such as attending classes and participating in extracurricular activities[,]" JA.22, and

- "sought to destabilize the campus for Jewish members of the Columbia community by subjecting them to intimidation, harassment, and terror[,]" JA.27.

In other words, plaintiffs repeatedly pled and emphasized a broader conspiracy aimed at intimidating and harassing the Jewish community and depriving them of civil rights. Against the backdrop of these allegations, a political objective standing alone does not negate the plausible inference that class-based discrimination was also at work. And the district court's refusal to even acknowledge *these* allegations, which support an inference of discriminatory purpose, cannot be reconciled with its willingness to accept the alleged political purpose or the appropriate standard under Federal Rule of Civil Procedure12(b)(6). *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).

As to the plan to seize and take over Hamilton Hall, the Complaint went well beyond alleging a political aim; plaintiffs detailed that "Defendants plotted and agreed to take control of Hamilton Hall not only as a symbolic measure . . . but also to wield power and leverage, and to create an atmosphere of terror and submission for those who were in the

targeted class as well as anyone who might stand in their way." JA.50.[1] In other words, extracting political concessions was *one* purpose of the takeover, but intimidating, harassing, and terrorizing the Jewish community was another—according to allegations of the Complaint that must be taken as true.

In viewing the seizure of Hamilton Hall as the *objective* of the conspiracy, the district court also overlooked that it served as *an act in furtherance* of a broader conspiracy. For example, plaintiffs referred to the plotted takeover "as part of and in furtherance of the conspiracy[,]" not its sole aim. JA.50-51. When describing the broader conspiracy to harass, terrorize, and deny civil rights of a class consisting of Jews and their supporters (perceived or actual), plaintiffs described that "Defendants planned the violent takeover and occupation of Hamilton Hall" "[i]n furtherance of this conspiracy[.]" JA.9. So, even accepting the district court's conclusion that the purpose behind storming Hamilton Hall was a purely political one, a reasonable inference can be drawn that

[1] *See also* JA.51, 54 (defendants' "plan also included intimidating, harassing, bribing, detaining, assaulting, and/or battering those who were or were perceived to be Jews or supporters of Jews, as well as anyone who might stand in their way").

it was also an act in furtherance of the conspiracy's broader, discriminatory purpose.

4. The defendants cannot escape this conclusion by invoking the First Amendment, and the district court erred in accepting such a proposition. Despite acknowledging that "words and actions . . . [may] fairly evidence[] the 'conscious aim or objective'" of a conspiracy (JA.92), the court held that defendants' statements "are pure political speech allegations, and so do not admit of an inference that the Occupiers had the conscious aim and objective of depriving Jews and their perceived supporters of their rights." JA.94.

The First Amendment, however, "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993); *see also Dawson v. Delaware*, 503 U.S. 159, 165 (1992). "Courts have long recognized that there is no constitutional problem with using offensive speech as evidence of motive or intent." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 267 (S.D.N.Y. 2025) (citation modified). The district court erred in brushing aside the defendants' anti-Semitic statements as incapable of supporting an inference of discriminatory

animus or objective in the context of the whole Complaint. JA.94; *see also* pp. 26-28, *infra*.

### B. A lawful or political objective does not negate an inference of discriminatory animus or purpose where discriminatory means are used to achieve that lawful objective.

Even if the district court were correct that the only purpose of the conspiracy was a political one, the use of unlawful means to achieve that political objective—for example by harassing and terrorizing Jewish individuals—still supports a reasonable inference that a discriminatory animus or purpose exists here. The district court erred here in failing to meaningfully consider whether the Complaint alleged discriminatory means that support a plausible inference of discriminatory motive or purpose.

1. By disregarding some allegations, minimizing others, and selectively emphasizing only some aspects of the Complaint, the district court effectively imposed an incorrect pleading standard that ignored distinct evidentiary considerations in discrimination cases. *Compare* JA.10, 22, 29-30, 46-47, 74-76, 79-81, *with* JA.86-88, 92-95.

In plausibility determinations in discrimination cases, courts "must be mindful of the 'elusive' nature of intentional discrimination." *Vega v.*

*Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (citation omitted). Indeed, "clever men may easily conceal their motivations" and because proving motive involves "unstated intent and state of mind," "rarely is there 'direct, smoking gun, evidence of discrimination[.]'" *Ibid.* (citations omitted); *see also Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 392 (2d Cir. 2020) ("It bears recalling, that in discrimination cases, plaintiffs rarely produce direct evidence of retaliation."); *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir. 1997) (disclaiming the need for "a virtual admission of illegality"). Plaintiffs must instead "rely on 'bits and pieces' of information to support an inference of discrimination, *i.e.*, a 'mosaic' of intentional discrimination." *Vega*, 801 F.3d at 86 (citation omitted).

Consequently, "at the initial stage of a litigation, the plaintiff's burden is 'minimal'—he need only plausibly allege facts that provide 'at least minimal support for the proposition that the [defendant] was motivated by discriminatory intent.'" *Vega*, 801 F.3d at 86-87 (citation omitted). In establishing motive, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Rogers v. Missouri Pac. R.R. Co.*, 352 U.S. 500, 508 n.17

(1957). And courts "must assume the factual allegations in the complaint to be true, 'even if [they are] doubtful in fact,' and a complaint may not be dismissed 'based on a judge's disbelief of a complaint's factual allegations[.]'" *Vega*, 801 F.3d at 86 (first brackets in original; citation omitted).

In probing discriminatory motive, courts err when considering "each piece of evidence in a vacuum, rather than engaging in the totality of the circumstances analysis." *North Carolina State Conf. of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016); *see also Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1223-1224 (10th Cir. 2015) ("'[A] discrimination analysis must concentrate not on individual incidents, but on the overall scenario,' which is informed by the sum total of those incidents." (citation omitted)). Instead of deciding which specific allegations, standing alone, would or would not establish animus or invidious purpose, courts should consider "the totality of the circumstances[.]" *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995); *see also Gartenberg*, 765 F. Supp. 3d at 267.

2. The Complaint here sufficiently pled that discriminatory means were used to achieve the conspiracy objective, supporting an inference of

discriminatory motive or purpose. Section 1985(3) expressly contemplates that liability can exist when two or more persons conspire to deprive a person of equal protection of the laws "either directly *or indirectly*[.]" 42 U.S.C. 1985(3) (emphasis added). *Bray* then clarifies Section 1985(3)'s motivation requirement turns on whether a course of action (the means) was "selected or reaffirmed . . . at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." 506 U.S. at 272 (citation omitted). Accordingly, at the pleading stage, those adverse effects, and the defendants' deliberate selection of a course of action that produces them, are relevant to the question of discriminatory motive or purpose notwithstanding a political objective.

Other discrimination contexts illustrate this principle. In the Title VII context, the Supreme Court has emphasized that courts cannot ignore discriminatory conduct used to reach a non-discriminatory objective. In *Ricci v. DeStefano*, 557 U.S. 557, 562 (2009), a city fire department had been relying upon an objective examination to determine the best qualified candidates to be promoted to the rank of lieutenant or captain. When the 2003 "examination results showed that white

candidates had outperformed minority candidates," *ibid.*, "the City rejected the test results because 'too many whites and not enough minorities would be promoted were the lists to be certified.'" *Id.* at 579 (citation omitted). The city's conduct was "express, race-based decisionmaking[,]" and therefore "violate[d] Title VII's command that employers cannot take adverse employment actions because of an individual's race" absent some other justification. *Ibid.*

The city alleged it was motivated to reject the test results to "avoid[] disparate-impact liability[.]" *Ricci*, 557 U.S. at 579-580. Nevertheless, "[w]hatever the City's ultimate aim—however well intentioned or benevolent it might have seemed—the City made its employment decision because of race." *Ibid.* Accordingly, the Supreme Court adopted a standard prohibiting the use of race-conscious actions to avoid disparate-impact liability, absent strong evidence of such liability.

The Seventh Circuit provides an eloquent explanation of this principle: "[d]iscrimination may be instrumental to a goal not itself discriminatory, just as murder may be instrumental to a goal not itself murderous (such as money); it is not any the less—it is, indeed, more clearly—discriminatory on that account." *Village of Bellwood v. Dwivedi*,

895 F.2d 1521, 1531 (7th Cir. 1990). Thus, if "a merchant refuses to hire black workers not because he is racist but because he believes that his customers do not like blacks and will take their business elsewhere if he hires any[,]" that refusal is still intentional discrimination "because it is treating people differently on account of their race." *Id.* at 1530.[2]

A similar principle can be seen in redistricting and racial gerrymandering cases. In *Cooper v. Harris*, 581 U.S. 285, 291 n.1 (2017), the Supreme Court observed that nothing about the discriminatory motive analysis changes just because race-based lines were drawn "in order to advance [non-race-based] goals, including political ones." *See also Bush v. Vera*, 517 U.S. 962, 968 (1996). It is just as unlawful and discriminatory to "use race as the[] predominant districting criterion with the end goal of advancing their partisan interests." *Cooper*, 581 U.S. at 308 n.7; *see also Alexander v. South Carolina State Conf. of the NAACP*, 602 U.S. 1, 7 n.1 (2024).[3]

---

[2] While *Dwivedi* involved a Title VIII claim, as is routine in discrimination cases, the court applied the Title VII framework. 895 F.2d at 1529.

[3] The predominant-factor standard applicable in racial gerrymandering cases, however, differs from the lower standard applicable here.

This principle applies with equal force in the Section 1985(3) context: a conspiracy may have a lawful objective while the means used to achieve that objective are motivated by discriminatory animus or undertaken in part for a discriminatory purpose.[4] Even if the defendants were seeking to achieve a purely political, non-racial objective, they can't do so by conspiring to harass the Jewish community. Here, the Complaint contained sufficient facts to support an inference that the means selected to accomplish the political purpose were selected or motivated at least in part because of the invidiously discriminatory adverse effects on the Jewish community.

3. The campaign described in the Complaint (*i.e.*, defendants' means) was succeeding in intimidating and driving its targets—the Jewish community—from Columbia's campus. Days before the Hamilton Hall takeover, the encampment and related disruptions posed such "a clear and present danger to the substantial functioning of the University" (JA.28), that "the Director of Columbia's Orthodox Union-Jewish

[4] Again, courts consistently adopt and apply the same framework in analyzing discriminatory motive across various discrimination claims. *See Bray*, 506 U.S. at 272 n.4.

Learning Initiative issued a warning" about "Jewish students' safety in the face of extreme anti-Semitism and anarchy[,]" and to "strongly recommend you return home as soon as possible and remain home until the reality in and around campus has dramatically improved." JA.30. Again, the Complaint alleges "Jewish students and other Jewish members of the Columbia community were frequent targets of harassment and assaults." JA.22.

In the April 29, 2024, statement cited by plaintiffs (JA.10 n.2), Columbia's President emphasized the importance of complying "with time, place, and manner restrictions which, for example, prevent loud protests at night when other students are trying to sleep or prepare for exams[,]" concluding that "[o]ne group's rights to express their views cannot come at the expense of another group's right to speak, teach, and learn." Press Release, Columbia Univ., Statement from Columbia University President Minouche Shafik (Apr. 29, 2024), https://perma.cc/5LB7-AV5R.[5] President Shafik described a need "to

[5] Favorable inferences should be drawn from materials on which the complaint relies and incorporates by reference. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, . . . materials

protect every member of our community from harassment and discrimination[,]" and "calls for violence," acknowledging "that many of our Jewish students, and other students as well, have found the atmosphere intolerable in recent weeks" and "left campus[.]" *Id.* at 2. President Shafik then concluded "[t]he encampment has created an unwelcoming environment for many of our Jewish students and faculty[,]" and "'a hostile environment [for Jews] in violation of Title VI [of the Civil Rights Act of 1964] . . . that is unsafe for everyone." *Ibid.*

Thereafter, the Complaint alleges the defendants purposefully devised a plan to takeover Hamilton Hall, and defendants themselves labeled the Hamilton Hall takeover an *escalation*—a continuation of the existing conspiracy, not a separate, discrete one. *See* JA.8, 46; *see also* JA.35 ("Rather than indefinitely continue our encampment and the media circus that surrounded it, we chose to escalate."). Using the word "escalate" creates a plausible inference that defendants purposefully intended—and acted "at least in part 'because of,' not merely 'in spite

---

incorporated in it by reference, . . . and documents that, although not incorporated by reference, are 'integral' to the complaint[.]").

of'"—the consequences and effects that followed. *Bray*, 506 U.S. at 272 (citation omitted).

The district court ignored or minimized these allegations in concluding the "context of the broader climate of anti-Semitic hatred and violence that had engulfed Columbia's campus" did "not make the deprivation of Jewish (or perceived Jewish) rights a conscious objective of this particular conspiracy." JA.95 (quoting Doc. 25, at 33). The Complaint plausibly depicts an atmosphere of actual intimidation directed toward the Jewish community. While those effects alone do not establish discriminatory intent or purpose, they reinforce a plausible inference that defendants were more than just aware of the effect the seizure of Hamilton Hall would have on the Jewish community. At a minimum, plaintiffs plausibly alleged that defendants pursued discriminatory means to accomplish the political object of the conspiracy precisely because of their effects.

The district court also erred in compartmentalizing the conduct of Hamilton Hall and the campus-wide anti-Semitic violence. *See* JA.92-95. The anti-Semitic vitriol that characterized the campus-wide events leading up to April 30, 2024, was equally evident in the Hamilton Hall

takeover. *See, e.g.*, JA.10 (alleging the encampment "was a hotbed of virulent anti-Semitism" where "Jewish students were barred from entry, physically assaulted, and subjected to calls of 'Yahoodim, yahoodi [Jews, Jew], fuck you,' 'stop killing children,' 'go back to Poland,' 'Nazi bitches,' and 'go to a synagogue'"). In the middle of the Hamilton Hall seizure, conspirators were shouting at the plaintiffs, "Why are you defending them?" "What are you, a Jew-lover?" and repeatedly calling Mr. Torres a "Jew-lover." JA.42. And to Mr. Wilson: "You work for the Jews[.]" JA.46. That continuity supports a plausible inference that anti-Semitic animus was integral, not incidental, to the Hamilton Hall takeover.

The facts alleged in the Complaint, however, involved far more than simple speech, and much of the speech fueling the vitriol occurred while participants were engaged in improper or illegal conduct violating Columbia's reasonable time, place, and manner restrictions and in the context of ongoing breaches of university rules and policies. In the April 30, 2024, letter to the New York Police Department cited in the first amended Complaint (JA.47 n.56), Columbia's President explained that "[t]he individuals who established the encampment violated a long list of

rules and policies," and "over 100 students were arrested and charged with trespassing" when the NYPD dismantled the encampment. JA.29.

The Hamilton Hall takeover obviously involved conduct that violated University rules and laws. In that same April 30 letter, President Shafik concluded "[t]he individuals who have occupied Hamilton Hall have vandalized University property and are trespassing." JA.47. These events raised "serious safety concerns for the individuals involved and the entire community." JA.47. And the Complaint repeatedly emphasized the violent nature of the takeover of Hamilton Hall and the assault upon the plaintiffs. *See* JA.8, 40-42. Both plaintiffs felt trapped and feared their lives were in danger. JA.41-42.

Speech that could otherwise be viewed as purely political in isolation here occurred in the context of unlawful conduct that could reasonably be understood as intimidating or harassing. That context is important: "a reasonable person should perceive offensive political speech communicated through generally accepted means (say, during a debate in the breakroom or in a flier pinned to a bulletin board) differently to offensive messages conveyed in a manner that does not conform to reasonable social expectations (for instance, by vandalizing a

hallway)." *Gartenberg*, 765 F. Supp. 3d at 266. And just as "evidence that a white student attended a Ku Klux Klan rally, though protected expression or association in and of itself, may properly be considered in determining whether unprotected harassing conduct directed at his African-American classmates was motivated by race[,]" evidence of anti-Semitic statements occurring during an unlawful takeover of a university building may properly be considered in determining whether defendants' conspiracy was motivated by an invidious purpose. *Id.* at 267.

The totality of allegations pled by plaintiffs plausibly support a conclusion that defendants took action because of, not merely in spite of, the adverse effects upon the Jewish community, and that the conspiracy was accomplished through discriminatory means.

## II. Membership in the targeted class is not a prerequisite for Section 1985(3) liability.

The district court erred in treating the fact plaintiffs were not members of the protected class as fatal to their claims. *See* JA.96-97. Any interpretive exercise of Section 1985(3) should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), and with "the assumption that the ordinary meaning of that

language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-176 (2009) (citation omitted).

Under Section 1985(3)'s plain text, when a conspiracy formed "for the purpose of depriving" "any person or class of persons" of equal protection, and "another is injured in his person or property, *or* deprived" of a right or privilege by "an[] act in furtherance of the object of such conspiracy," "the party so injured or deprived" can sue. 42 U.S.C. 1985(3) (emphasis added). Put differently, the text of Section 1985(3) allows for recovery by "another" person—any other person beside the defendant—so long as he is either "injured in his person or property, or deprived" of a right. *Ibid.* The text, therefore, contemplates recovery by someone who has not been "deprived of having [or] exercising any right or privilege," so long as that person is "injured." *Ibid.*

Congress tied recovery to "the party so injured[,]" not strictly the person or class of persons targeted for the "purpose of depriving" them of "equal protection" or "equal privileges." 42 U.S.C. 1985(3). Nothing in that text limits the recovering individual to an actual member of the protected class whose rights were deprived.

Contrast this language and structure with that of Section 1983. Section 1983 contemplates that when "any citizen of the United States or other person" is "subjected" "to the deprivation of any rights" or privileges, the perpetrator "shall be liable to the party injured." 42 U.S.C. 1983. There is no reference to a contemplated injury other than the deprivation of rights in that statute (as in Section 1985(3)). *Ibid.* The inclusion of "particular language in one section of a statute[,]" here Section 1983, while "omit[ting] it in another section of the same Act . . . is generally presumed" to mean "Congress act[ed] intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (citation omitted). If Congress wanted to limit a Section 1985(3) action to class members, it could have so said. Instead, the unambiguous language of Section 1985(3) permits any individual injured by a conspiracy to pursue a claim.

If that plain language were not enough, Supreme Court precedent makes unmistakable that Section 1985(3) extends beyond class members. In *United Brotherhood of Carpenters & Joiners of America, Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 836 (1983), the Supreme Court explained that "[t]he predominate purpose of § 1985(3) was to combat the prevalent

animus against [black Americans] *and their supporters*." *Ibid.* (emphasis added). Accordingly, while the Court concluded "it is a close question whether § 1985(3) was intended to reach any class-based animus" political association, it took as a given that Section 1985(3)'s class-based animus encompassed "animus against [black Americans] *and those who championed their cause*[.]" *Ibid.* (emphasis added); *see also id.* at 838 (citing congressional debates on the Civil Rights Act of 1871 as targeting animus "against [black Americans] and their sympathizers"); *accord Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) ("The original purpose of § 1985(3) . . . was to enforce the rights of African Americans and their supporters."); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271 n.2 (1993) (assuming an obstruction that "targets some men . . . does not render it any less 'class based' against women—just as a racial conspiracy against blacks does not lose that character when it targets in addition white supporters of black rights" (citation omitted)). Legislative history reinforces the same point. *See, e.g.*, *Life Ins. Co. of N. Am. v. Reichardt*, 591 F.2d 499, 505 (9th Cir. 1979) ("The Congressional debates evinced concern for all groups subject to the

organized lawlessness of the Ku Klux Klan, including all Unionists, Republicans, and certain religious groups.”).

It makes no difference to the class-based discriminatory animus, or Section 1985(3) liability in general, whether the individuals ultimately injured “are not Jewish,” or “support[] Jews.” JA.96. Although the Supreme Court precedent and legislative history focuses on supporters of the class targeted, neither the text of Section 1985(3) nor case law makes being a supporter of the targeted class a prerequisite to liability. At least one circuit, the Third Circuit, has addressed his broader question directly, holding: “a § 1985(3) plaintiff need not be a member of the class against which a conspiracy directs its invidiously discriminatory animus, even if in practice this is most often the case.” *Farber v. City of Paterson*, 440 F.3d 131, 141 (3d Cir. 2006).

Nor is there a meaningful distinction between a supporter and an otherwise unaffiliated individual mistakenly targeted. After all, the invidious motive and purpose remain regardless of whether the acts in furtherance of the conspiracy sweep up members of the class, supporters, perceived supporters, or bystanders. The relevant class is still defined by the object of the conspirators’ discriminatory intent, not the individual

identity of each individual plaintiff harmed by the conspiracy. A conspiracy directed at individuals with "sympathetic views towards" black Americans in the Reconstruction era did not lose its anti-black discriminatory aim merely because the immediate victim was white. *Scott*, 463 U.S. at 836.

So too, a conspiracy directed at individuals because of their support (actual or perceived) for Jewish people does not lose its anti-Semitic discriminatory aim merely because the immediate victim is not Jewish. The object of the conspirators' discriminatory intent remains the same: harassing and terrorizing the Jewish community. One means of accomplishing that objective is by terrorizing individual supporters and perceived supporters. *See* pp. 14-15, *supra*; *see also* JA.13, 40-46. This serves to intimidate the Jewish community, who can expect the same or worse treatment. Here, plaintiffs plausibly pled they were injured by actions in furtherance of a conspiracy to harass and attack Jews and so-called "Jew-lovers." JA.7-8, 12, 42. No more is required.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

JEFFREY G. MORRISON
Deputy Assistant Attorney General

s/ Audrey A. Weaver
ANDREW G. BRANIFF
DAVID N. GOLDMAN
AUDREY A. WEAVER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 890-0949

Date: October 20, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) and Local Rule 29.1(c) because it contains 6500 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Audrey A. Weaver
AUDREY A. WEAVER
Attorney

Date: October 20, 2026