# No. 26-1773

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

---

MARIANO TORRES and LESTER WILSON,

Plaintiffs-Appellants,

v.

JAMES CARLSON, AIDAN PARISI, PEOPLE'S FORUM, INC., LISA FITHIAN, ETHAN CHOI, and JOHN DOES 1-40,

Defendants-Appellees.

---

On Appeal from the United States District Court
for the Southern District of New York,
No. 25-cv-3474 (CM)

**BRIEF OF AMICUS CURIAE**
**THE NATIONAL JEWISH ADVOCACY CENTER**
**IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

Mark Goldfeder
David Benger
National Jewish Advocacy Center
1954 Airport Rd. Suite 1196
Atlanta, GA 30341
(332) 278-1100
Mark@NJACLaw.org
David@NJACLaw.org

*Counsel for Amicus Curiae*
*The National Jewish Advocacy Center*

October 19, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus curiae the National Jewish Advocacy Center states that it is a nonprofit organization, that it has no parent corporation, and that no publicly held corporation owns ten percent or more of its stock.

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ........ 1

SUMMARY OF ARGUMENT ........ 1

ARGUMENT ........ 3

I. Bray separates effect from objective. It does not separate politics from animus, and the district court redrew the line in the wrong place ........ 3

A. A conspiracy may have more than one conscious objective, and the complaint pleads one the district court refused to see. ........ 3

B. The Klan Act was written for political enterprises that ran on discriminatory terror. The district court's dichotomy would have acquitted the statute's namesake. ........ 6

C. The attackers' words are evidence of the conspiracy's objective, not speech to be punished. ........ 8

D. Spencer v. Casavilla confirms, rather than defeats, the plaintiffs' theory. ........ 11

II. A conspiracy that harms others alongside its targets has not thereby spared the target. The mixed-target holding converts the scope of an attack into a defense for the attacker. ........ 15

III. Section 1985(3) protects those whom a conspiracy targets as supporters of a protected class, whatever their private beliefs. ........ 18

IV. The opinion's three holdings are one error stated three times, and the opinion cannot keep them apart ........ 23

CONCLUSION ........ 26

CERTIFICATE OF COMPLIANCE ........ 27

CERTIFICATE OF SERVICE ........ 28

## TABLE OF AUTHORITIES

### Cases

*Arsham v. Mayor & City Council of Baltimore*, 85 F. Supp. 3d 841 (D. Md. 2015) ....................21

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................24

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993)..... 2, 4, 11, 14, 22

*Capek v. BNY Mellon, N.A.*, No. 15-cv-4155 (LTS), 2016 WL 2993211 (S.D.N.Y. May 23, 2016) ....................21

*Davis v. Cisneros*, 744 F. Supp. 3d 696 (W.D. Tex. 2024) ....................6, 15

*EEOC v. WC&M Enterprises, Inc.*, 496 F.3d 393 (5th Cir. 2007) ....................21

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025) ....................9

*Griffin v. Breckenridge*, 403 U.S. 88 (1971) .................... passim

*Griffin-Nolan v. Providence Wash. Ins. Co.*, No. 5:04-CV-1453 (FJS/GJD), 2005 WL 1460424 (N.D.N.Y. June 20, 2005) ....................19

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995) ....................17

*Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008) ....................21

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286 (2d Cir. 1992) ....................20

*Keating v. Carey*, 706 F.2d 377 (2d Cir. 1983) ....................7

*Pisello v. Town of Brookhaven*, 933 F. Supp. 202 (E.D.N.Y. 1996).................... 19, 23

*Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298 (S.D.N.Y. 1996) ....................21

*Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987) ....................20

*Sines v. Kessler*, 324 F. Supp. 3d 765 (W.D. Va. 2018).................... 16, 23

*Spencer v. Casavilla*, 44 F.3d 74 (2d Cir. 1994) ....................11

*StandWithUs Ctr. for Legal Justice v. Mass. Inst. of Tech.*, 158 F.4th 1 (1st Cir. 2025) ....................8, 23

*Straker v. Metropolitan Transit Authority*, No. 03-CV-1756 (FB)(KAM), 2005 WL 3287445 (E.D.N.Y. Dec. 5, 2005) ....................10

*Torres v. Carlson*, No. 25-cv-3474 (CM), 2026 WL 1534439 (S.D.N.Y. June 1, 2026) ........ passim

*United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825 (1983) ........ 6, 15, 19

*Waller v. Butkovich*, 584 F. Supp. 909 (M.D.N.C. 1984) ........ 16, 17, 20, 23

*Weinberg v. Nat'l Students for Justice in Palestine*, 2026 WL 184302 (C.D. Cal. Jan. 20, 2026) ........ 12, 13, 23

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ........ 8

**Statutes**

42 U.S.C. § 12102(3) ........ 21

42 U.S.C. § 1982 ........ 20

42 U.S.C. § 1985(3) ........ passim

**Other Authorities**

S. Rep. No. 42-1 (1871) ........ 6, 15

## INTEREST OF AMICUS CURIAE

The National Jewish Advocacy Center is a nonprofit legal organization dedicated to protecting the rights of the Jewish people through the legal system.[1] Its attorneys litigate and advise on cases of antisemitic discrimination and violence arising under the federal civil rights laws, including the Ku Klux Klan Act, 42 U.S.C. § 1985(3). Amicus has a direct interest in the question this appeal presents: whether a conspiracy that pursues its political demands through invidiously discriminatory intimidation and violence escapes the Klan Act because the demands were political. The district court answered yes. That answer would retire the statute in the very cases for which Congress wrote it, and amicus submits this brief to supply the statutory history and doctrinal structure the opinion below left out.

## SUMMARY OF ARGUMENT

The Ku Klux Klan Act exists because the Klan pursued political ends through racially motivated terror. The Supreme Court and this Court have both described the enterprise Congress had in view that way. The district court held that because the

[1]Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) and Second Circuit Local Rule 29.1(b), amicus curiae states that no party's counsel authored this brief in whole or in part; that no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and that no person other than amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief. All parties have consented to the filing of this brief.

Hamilton Hall conspirators pursued political ends, their racially framed terror was legally beside the point. That holding misreads *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), and it inverts the statute *Bray* construed. A political objective does not neutralize the animus with which a conspiracy selects its victims. And a statute written to reach the Klan cannot be read to spare it.

*Bray* asks one question: was the deprivation of protected rights a "conscious objective of the enterprise," pursued "at least in part for the very purpose of producing it"? *Id.* at 275–76. "At least in part" governs both of the statute's mental elements: *Bray* borrowed the phrase from the equal protection cases for the animus requirement, *id.* at 271–72, and applied it again to the intent requirement, *id.* at 275–76. A conspiracy may have more than one objective; the district court said so itself, and then required the plaintiffs to plead that discrimination was the only one. The class the complaint pleads is "people who are or are perceived to be Jews or supporters of Jews." FAC ¶ 148. The right is "to be free from racial violence." FAC ¶ 149. The complaint alleges a pre-planned midnight seizure, contingency violence agreed upon in advance against anyone found inside, and an assault executed and explained in expressly antisemitic terms, by a mob that told its victims why they were being beaten. Those allegations plead a conscious objective under any honest reading of *Bray*.

Three further errors flow from the first. The court held that a conspiracy willing to harm "anyone who might stand in their way," FAC ¶¶ 150, 154, cannot harbor class-based animus, a rule under which the historical Klan, which murdered white Republicans alongside Black freedmen, would have pleaded its way out of its own statute. The court dismissed the attackers' antisemitic vocabulary as "pure political speech," confusing punishing speech, which the First Amendment forbids, with reading speech as evidence of motive, which the Supreme Court has unanimously endorsed. *Torres v. Carlson*, No. 25-cv-3474 (CM), 2026 WL 1534439, at *12 (S.D.N.Y. June 1, 2026) ("Op."). And the court announced that no case has ever protected a person targeted as a perceived supporter of a protected class. Op. at *16. But courts have sustained § 1985(3) claims by plaintiffs whom their attackers identified as supporters of a protected class, and the founding case of the modern doctrine treated the attackers' mistaken belief about a victim's civil-rights ties as evidence of racial animus. *See Griffin v. Breckenridge*, 403 U.S. 88, 103 (1971).

The judgment below should be reversed.

## ARGUMENT

### I. Bray separates effect from objective, not politics from animus, and the district court redrew the line in the wrong place.

### A. A conspiracy may have more than one conscious objective, and the complaint pleads one the district court refused to see.

To be clear, the line *Bray* drew is real and worth defending. Political protest, however obnoxious, is not a federal civil rights conspiracy merely because protected rights are bruised along the way; the deprivation must be "a conscious objective of the enterprise," and the conspirators "must act at least in part for the very purpose of producing it." *Bray*, 506 U.S. at 275–76. But "at least in part" is the operative phrase, and the district court read it out of the standard. The opinion acknowledges, correctly, that "a conspiracy can, of course, have more than one objective." Op. at *9. One page earlier it holds that "the purpose (and the only purpose) of the alleged conspiracy" was to seize and hold Hamilton Hall until Columbia acquiesced. *Id.* at *8. The court stated the correct rule and applied the opposite one. Under *Bray*, the question was never whether the takeover had a political objective. It was whether the pleaded facts admit an inference that depriving a protected class of its rights was among the enterprise's objectives. *Bray*, 506 U.S. at 276. They do.

The complaint, whose allegations the court was bound to accept and construe in the plaintiffs' favor, alleges that the conspirators planned the seizure in advance with maps, supplies, and barricade materials; that they "addressed the possibility that Columbia employees might be inside Hamilton Hall and agreed that they would, as necessary, intimidate, harass, bribe, detain, threaten, and/or assault and batter such employees if they posed any obstacles to the execution of the plan"; and that when the contingency arrived, the violence was administered in the vocabulary of the

protected class. Op. at *4, *7–8; FAC ¶¶ 101–102. Torres was surrounded by dozens of masked rioters, struck from behind, rammed with furniture, and asked, while being beaten, "What are you, a Jew-lover?" The rioters "repeatedly called him 'Jew-lover.'" Op. at *5. In the lobby on a different floor, a different set of rioters gave Wilson the same explanation: "You work for the Jews" and "You're a Zionist." *Id.* When the operation was complete, its authors hung a banner reading "INTIFADA" from the third-floor balcony. *Id.* A slur that travels with the operation, floor to floor and victim to victim, belongs to the operation.

The district court characterized the planned violence against building occupants as "simply a side effect, a possibility with which the alleged conspirators were prepared to deal." Op. at *9. A side effect is what happens without design. Contingency violence agreed to in advance, then executed on cue and narrated in class terms, is design, and the class terms are a selection criterion. When the conspirators found Torres and Wilson, they did not treat them as neutral obstacles. They beat the two men because they took them for supporters of Jews, and said so as their blows landed. Op. at *5. A deliberate assault, inflicted because of the victims' perceived connection to a protected class, is a conscious objective. It is also the very allegation the court held was missing. The court found "not a single allegation in the FAC that admits of an inference that the alleged conspirators acted for the purpose of depriving anyone of any civil rights." Op. at *9. The conspirators

supplied that allegation themselves, aloud, as they inflicted the injury. The conspirators' politics do not explain that violence away; its discriminatory character answers to a purpose of its own.

### B. The Klan Act was written for political enterprises that ran on discriminatory terror. The district court's dichotomy would have acquitted the statute's namesake.

The deeper flaw in the opinion is its unstated premise that a political objective and a discriminatory objective are rivals, so that identifying the first negates the second. The Ku Klux Klan Act is a standing refutation of that premise. The Senate committee whose findings prompted the Act reported that the Klan "has a political purpose, is composed of members of the democratic or conservative party, has sought to carry out its purpose by murders, whippings, intimidations, and violence, against its opponents." S. Rep. No. 42-1, at xxxi (1871), quoted in *Davis v. Cisneros*, 744 F. Supp. 3d 696, 720 (W.D. Tex. 2024), appeal docketed, No. 25-50693 (5th Cir.). In 1871 the Klan was understood primarily as a political organization; racial terror was its method. *See id.* The Supreme Court has said the same, in a decision holding that the statute does not reach economic or commercial animus: "The predominant purpose of § 1985(3) was to combat the prevalent animus against Negroes and their supporters." *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 836 (1983). That was a political objective, and racial

terror was the means. The animus Congress legislated against was the animus of an enterprise whose announced demands were political.

Indeed, over forty years ago, Judge Lumbard observed the same for this Court, in a decision holding that a Republican targeted for his party affiliation stated a § 1985(3) claim. He wrote, "A century later, the view of the Act is apt to be distorted by the current perception of the Klan as a racist organization. The Congress of 1871, however, did not view the Klan solely as a racist organization to oppress blacks but as a political organization intent on establishing Democratic hegemony in the South." *Keating v. Carey*, 706 F.2d 377, 387 (2d Cir. 1983).

Run the district court's logic through the statute's founding facts. The Klan's purpose, and on the opinion's reasoning its only purpose, was political: defeat Reconstruction, restore Democratic rule. The whippings were contingency planning for anyone who got in the way. The epithets were the unauthorized remarks of individual night riders. On that reading, the paradigm defendant pleads out of the paradigm statute. The Klan had demands too. No one has ever thought the demands were a defense.

The Act's premise is precisely the one the district court refused to entertain: that invidious discrimination can supply the means, the target selection, and the operational logic of a conspiracy whose ultimate demand is framed in political terms, and that prohibiting the pursuit of political ends through discriminatory intimidation,

violence, and terror is what the statute is for. A rule that rewards conspirators for stating their demand politically while executing it discriminatorily converts the Klan Act into a drafting exercise.

**C. The attackers' words are evidence of the conspiracy's objective, not speech to be punished.**

The district court classified the conspirators' calls for intifada, the banner, and the surrounding rhetoric as "pure political speech" from which no inference of purpose may be drawn. Op. at *12. That ruling confuses two very different things. Nobody asks this Court to punish a chant. The complaint offers the words as evidence of what the enterprise was consciously trying to do, and the Supreme Court resolved the constitutional question unanimously more than thirty years ago: "The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993). Even the First Circuit decision on which the opinion below leans acknowledged that anti-Zionist rhetoric, while not categorically antisemitic, can be wielded as a tool of the antisemite where the surrounding facts support the inference. *See StandWithUs Ctr. for Legal Justice v. Mass. Inst. of Tech.*, 158 F.4th 1, 17 (1st Cir. 2025), petition for cert. filed, No. 25-1404 (U.S. June 18, 2026). The decision the First Circuit cited for that proposition, *Gartenberg,* observed at the pleading stage that there are "no magic words or phrases needed to show that harassment was

motivated by a protected characteristic," and that "even facially neutral words and phrases can be highly probative of discriminatory intent depending on the circumstances and social context in which they are communicated." *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 268–69 (S.D.N.Y. 2025).

Wilson was also told "You're a Zionist." Op. at *5. The district court filed that word under the "fraught" question whether anti-Zionism is antisemitism, Op. at *12 & n.5, and amicus does not ask this Court to answer that question. Wilson had said nothing about Israel. The only things the rioters knew about him were that he worked for Columbia and would not leave, so the word hurled at him was a label, not a position on the Middle East, and *Gartenberg* asks what the label meant in the mouths of the people using it. The same rioters answered in the same breath: "You work for the Jews." Op. at *5. Whatever "Zionist" means in a seminar, in that lobby it meant Jew, or Jew's man, and at the pleading stage the complaint is entitled to that inference.

The opinion below attempts to evade crucial facts by minimizing them. It attributes the slurs to "some John Doe protesters" and insists that intent "must motivate the group of conspirators; not just individual members of the conspiracy." Op. at *12. Then, in a footnote, the mob becomes a soloist: "'Jew lover,' which one unnamed protester called Mr. Torres, is unquestionably an antisemitic remark." Op.

at *12 n.5. The opinion's own statement of facts says otherwise. "Rioters shouted," plural; "They repeatedly called him 'Jew-lover'"; and they did so during the sustained physical assault by Carlson, Yancy, and Choi. Op. at *5. Wilson heard the same message from different rioters in a different part of the building. *Id.* The footnote concedes the remark was "unquestionably" antisemitic and preserves the holding only by rewriting its own plural as a singular. A court may not dismember a mob into individuals at the pleading stage and then fault the complaint for alleging only individual animus.

*Straker v. Metropolitan Transit Authority* held that a § 1985(3) claim fails where "the plaintiff alleges that only one conspirator was so motivated," because the animus of one member cannot be attributed to the group. No. 03-CV-1756 (FB)(KAM), 2005 WL 3287445, at *3 (E.D.N.Y. Dec. 5, 2005). The FAC alleges that far more than one conspirator was so motivated. Rioters shouted the epithets at Torres while Carlson, Yancy, and Choi beat him, and different rioters delivered the same message to Wilson elsewhere in the building. Op. at *5.

The opinion closes this part of its analysis by demanding planning-stage minutes: the pleading, it says, contains no allegation that the defendants, "while planning their takeover of Hamilton Hall, equated 'anyone who got in their way' with 'supporters of Jews.'" Op. at *14. Conspirators rarely transcribe their animus into the meeting agenda. Purpose is proven the way it has always been proven, by

acts in furtherance and words at the scene, and here the conspirators equated the two categories out loud, mid-assault, in the only transcript that exists. If the objective of an enterprise may be established only from its planning documents, the Klan Act will wait forever for a defendant candid enough to convict himself in advance.

### D. Spencer v. Casavilla confirms, rather than defeats, the plaintiffs' theory.

This Court's decision in *Spencer v. Casavilla*, 44 F.3d 74 (2d Cir. 1994), distilled *Bray* into three requirements, including that the protected right be "consciously targeted and not just incidentally affected," *id.* at 77, and stated that a claimant must show "the predominant purpose of the conspiracy was interference with, or punishment for, the exercise of that right," *id.* at 79. Read in context, *Spencer* is about the fit between the conspiracy and the particular right pleaded. The *Spencer* plaintiffs, the family of a Black teenager chased down and killed by four white men in Brooklyn, pleaded interference with his right to travel, and the § 1985(3) theory failed because the racially motivated killing had nothing to do with where the victim was traveling; plaintiffs' counsel conceded at trial that the defendants did not assault him "because he was in an area they didn't want blacks to be in," so the effect on travel was incidental to an intent to assault. *Id.* at 79. Overwhelming animus could not substitute for targeting of the pleaded right.

Here the fit is exact. The pleaded right is the right to be free from racially motivated violence, and the complaint alleges that the violence itself was inflicted and justified in the vocabulary of the protected class. When the right at issue is freedom from race-based violence, race-framed violence is the targeting; there is no daylight between the conduct and the right through which the deprivation could slip out as "incidental." That is exactly the theory the *Weinberg* court sustained on encampment facts, where three Jewish members of the UCLA community sued the organizers of a campus encampment under § 1985(3). The district court below read *Weinberg* as finding it plausible that the organizers "acted at least in part with an intent to deprive the Jewish plaintiffs of their Thirteenth Amendment rights" to be free from race-based violence and exclusion. Op. at *11 (describing *Weinberg v. Nat'l Students for Justice in Palestine*, 2026 WL 184302 (C.D. Cal. Jan. 20, 2026)). *Weinberg* also rejected the very defense the district court accepted here, holding that "the law is clear that a purpose of depriving Plaintiffs of their federal rights need not be Defendants' only purpose in order for Plaintiffs to have a valid § 1985(3) claim." *Weinberg*, 2026 WL 184302, at *9.

The district court nonetheless distinguished *Weinberg* on two grounds. The first was the "sheer volume" of the UCLA complaint's allegations. The second was that those allegations ran "specifically and exclusively against Jews," whereas Torres and Wilson are not Jewish. Op. at *11. Part III answers the second ground.

The first misconceives what volume proves. *Weinberg* rested on an accumulation of incidents. The encampment ran an armed check-in and vouching system at its perimeter, a student was turned away after the security team saw his Star of David, a Jewish professor was assaulted, and antisemitic imagery covered the surrounding area. 2026 WL 184302, at *2, *8. That accumulation supplied the inference of conscious objective there, and it is one route to that inference. It is not the only one. *Bray* asks what an enterprise was consciously trying to do, not how many times it did it. A complaint that pleads a midnight paramilitary seizure, pre-planned contingency violence, targeted beatings, and slurs delivered mid-assault should not fail in the Southern District of New York because a different complaint in the Central District of California catalogued more incidents. Both complaints plead animus; the Hamilton Hall conspirators compressed theirs into a single night and said it to their victims' faces.

Take *Bray*'s question in the terms the complaint actually pleads. The class is "people who are or are perceived to be Jews or supporters of Jews." FAC ¶ 148. The right is "the right to be free from racial violence." FAC ¶ 149. The question is whether depriving members of that class of that right was a conscious objective of this enterprise, at least in part. The complaint answers it. The conspirators agreed in advance to use violence against the employees they might find inside. FAC ¶¶ 101–102. They found two, and they used it. They told both men why. Torres was asked,

"What are you, a Jew-lover?" as the blows landed, and the rioters "repeatedly called him 'Jew-lover.'" Wilson, penned in the lobby, was told "You work for the Jews" and "You're a Zionist." Op. at *5. A Jew-lover is a supporter of Jews. A man who works for the Jews is a supporter of Jews. The attackers put Torres and Wilson in the pleaded class in their own words, and the beating they administered is the deprivation the pleaded right forbids.

This enterprise chose these two men, chose the reason, and said the reason out loud while it acted. Depriving members of the pleaded class of the pleaded right was one of the things this conspiracy set out to do, and under *Bray* one is enough. The district court held otherwise only by rewriting the test. It required the plaintiffs to plead that discrimination was the conspiracy's single purpose, fixing "the purpose (and the only purpose) of the alleged conspiracy" as the seizure of the building. Op. at *8. *Bray* requires no such thing. It treated the conspirators' political demand as an answer to their animus, when the statute they are sued under was written for an enterprise that had both. And it treated the attackers' words as protected speech and therefore as no evidence at all, when the Supreme Court has held that the First Amendment leaves speech available to prove motive. Each of those rulings, applied to the Klan of 1871, would have acquitted it. *Bray* separates effect from objective. It does not separate politics from animus. The first ground of dismissal cannot stand.

## II. A conspiracy that harms others alongside its targets has not thereby spared the target. The mixed-target holding converts the scope of an attack into a defense for the attacker.

The district court's second ground was that because the conspirators planned to act against "anyone who might stand in their way," of any race or belief, the conspiracy "cannot be a racially-motivated conspiracy." Op. at *14. That premise has been false since Reconstruction. The Klan did not reserve its violence for Black Americans. The Senate found it acted "against its opponents," and that its targets included "members of the republican party, both white and colored." S. Rep. No. 42-1, at xxii, xxxi (1871), quoted in *Davis*, 744 F. Supp. 3d at 720. The Supreme Court has never found otherwise.

The Court observed, in *Carpenters*, that the statute's central concern reached animus against a protected class "and their supporters." 463 U.S. at 836. The district court itself relied on that very passage, in the opinion below, to "see no reason why the same principle ought not apply to Gentiles who are alleged to support Jews." Op. at *13. *Griffin*, the decision that first opened § 1985(3) to private conspiracies, points the same way. There, the Court held that the passengers adequately alleged injury from the conspiracy "whether or not the nonparty Grady was the main or only target of the conspiracy." 403 U.S. at 103. A conspiracy's primary target does not determine whether others it injures may recover. Courts applying that principle have

held, without difficulty, that a conspiracy targeting a protected class together with persons outside it states a claim.

In *Waller v. Butkovich*, 584 F. Supp. 909, 937 (M.D.N.C. 1984), Klansmen and Nazis attacked an anti-Klan rally in Greensboro, and the survivors sued as "communists, labor organizers, and/or advocates of equal rights for black people." The court refused to dismiss the § 1985(3) claim on the equal-rights theory, holding that the plaintiffs would have to prove that they were "identifiable in the defendants' eyes as members of a class of advocates of equal rights for black people," because "[o]therwise the defendants could not have singled them out as objects of a conspiracy on this ground." *Id.* at 937. In *Sines v. Kessler*, 324 F. Supp. 3d 765, 780–81 (W.D. Va. 2018), the civil action arising from the 2017 Unite the Right rally, the conspirators targeted racial minorities and their supporters together, and the § 1985(3) claims of the plaintiffs who sued as supporters of those minorities survived dismissal, *aff'd in part and vacated in part on other grounds* sub nom. *Sines v. Hill*, 106 F.4th 341 (4th Cir. 2024). Mixed targets are the historical norm, and Congress wrote the statute with that norm in view.

The complaint pleads exactly that. The defendants agreed in advance to use force against any employees they encountered, FAC ¶¶ 101–102, and the people who carried out that agreement called Torres and Wilson "Jew-lover" and accused them of "work[ing] for the Jews" while they did it. FAC ¶¶ 122, 133, 159, 173.

The district court's contrary rule produces a perverse incentive worth stating plainly: the more indiscriminate the enterprise's muscle, the safer the enterprise. A conspiracy that beats only Jews violates the Act; a conspiracy that beats Jews, perceived supporters of Jews, and whoever else wanders by is immunized by its own thoroughness. Congress did not enact a statute that racially motivated conspirators can satisfy by widening the circle of their victims.

Nor do the complaint's own words support the court's reading. The opinion treated the allegation that the plan covered the targeted class "as well as anyone who might stand in their way" as an admission negating direction at the class, invoking *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995), for the proposition that a general allegation must yield to a more specific one. Op. at *14. But "X as well as Y" presupposes X. As *Griffin* shows, a conspiracy's willingness to reach beyond its primary target does not contradict, and so cannot be "belied" by, the allegation that the primary target, the class pleaded at FAC ¶ 148, was among those it reached. *See Griffin*, 403 U.S. at 103.

The clause adds a category; it does not erase the one it is appended to. Reading a complaint that pleads "the targeted class as well as anyone in the way," FAC ¶ 150, as if it pleaded only "anyone in the way," *see also id.* ¶ 168, draws the one inference the claim cannot survive, which is the opposite of what Rule 12(b)(6) requires.

## III. Section 1985(3) protects those whom a conspiracy targets as supporters of a protected class, whatever their private beliefs.

The district court's third ground was that "people who are or are perceived to be Jews or supporters of Jews" is not a cognizable class, because, the court wrote, "no case of which this Court is aware has ever held" that a person merely perceived as supporting a protected class may sue under the deprivation clause. Op. at *16. But the principles that answer that question date to the case that opened § 1985(3) to private conspiracies. In *Griffin*, the conspirators blocked a car on a Mississippi highway and beat its Black passengers, "acting under a mistaken belief that R. G. Grady," the driver, "was a worker for Civil Rights for Negroes." 403 U.S. at 90. Grady was a Tennessean driving his passengers on "various errands" and "visiting friends," *id.*, and he was not a party; the petitioners were the passengers. The Court never asked what Grady actually believed about civil rights. The Court held that the complaint's allegations, including the conspirators' purpose to deprive Black citizens of equal rights and their mistaken belief about Grady, "clearly support the requisite animus to deprive the petitioners of the equal enjoyment of legal rights because of their race." *Id.* at 103. *Griffin* thus confirms that what attackers believe about a person's alignment with a protected class is evidence of class-based animus, whether or not the belief is accurate.

Torres and Wilson, like Grady, were singled out for what their attackers believed about them. They were doing their jobs when, in the attackers' eyes, their

presence became an act of alignment with the targeted class, FAC ¶ 148, an alignment the conspirators announced themselves by calling the men "Jew-lover" and accusing them of "work[ing] for the Jews." FAC ¶¶ 133, 159, 173.

The district court itself came close to this rule and then declined to follow it to its conclusion. Addressing the same "supporters" theory, the court observed that "The predominant purpose of § 1985(3) was to combat the prevalent animus against" a protected class "and their supporters," *Carpenters*, 463 U.S. at 836, and that courts have accordingly allowed white plaintiffs to sue under § 1985(3) where they were injured while seeking to vindicate the rights of a racial minority. Op. at *13 (citing *Pisello v. Town of Brookhaven*, 933 F. Supp. 202, 216 (E.D.N.Y. 1996), and *Griffin-Nolan v. Providence Wash. Ins. Co.*, No. 5:04-CV-1453 (FJS/GJD), 2005 WL 1460424, at *10 (N.D.N.Y. June 20, 2005)). But the court then required something *Pisello* itself never required: proof that Torres and Wilson privately "support[ed] Jews or Jewish causes as a matter of personal belief," faulting them for being "two non-Jewish janitors, whose political and religious beliefs and sympathies are utterly unknown." Op. at *13–14. The complaint alleges no such belief because § 1985(3) has never required one; it alleges what the conspirators did and said. FAC ¶¶ 101–102, 133, 159, 173.

*Pisello's* plaintiff was not asked what he privately believed about the families he housed. He was asked what the conspiracy did to him because of the role it

assigned him. 933 F. Supp. at 216. *Waller* states the standard in terms of the defendants' perception: the plaintiffs had to be "identifiable in the defendants' eyes as members of a class of advocates of equal rights for black people," and the court left that to proof. *584 F. Supp. at 937.* Torres and Wilson meet that standard on the face of the complaint.

Nor does it matter that Torres and Wilson "were not parading in support of Jewish rights" the way civil rights marchers once did. Op. at *13. Grady did not march for anyone. He drove a car. *Waller* asked only what the plaintiffs were in the defendants' eyes. 584 F. Supp. at 937. A rule that requires demonstrated public advocacy as the price of protection finds no support in *Waller* or in *Griffin*.

The doctrinal structure the district court found missing is in fact settled; the court simply misassigned perception's role. Perception does not define the class. The class is Jews, a class protected under the Reconstruction-era civil rights statutes, *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (Jews are a protected race under 42 U.S.C. § 1982), and under § 1985(3) in this Circuit, *Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of N.Y., Inc.*, 968 F.2d 286, 291–92 (2d Cir. 1992).

Perception identifies whom the anti-Jewish animus selected for injury, FAC ¶ 148. It need not identify a separate class of its own, and it need not be accurate to serve that function.

Furthermore, Congress has written perception into the civil rights canon directly, protecting those "regarded as" disabled whether or not they are. 42 U.S.C. § 12102(3). The rest of the canon is in accord. The principle recurs wherever discrimination law asks what the discriminator believed rather than what was true.

An employee mistakenly believed to be Jewish states a claim when her employer's assumption, not her actual faith, drove the discrimination. *Capek v. BNY Mellon, N.A.*, No. 15-cv-4155 (LTS), 2016 WL 2993211, at *3 (S.D.N.Y. May 23, 2016), quoting *Arsham v. Mayor & City Council of Baltimore's description* of the contrary view as "fundamentally abhorrent," 85 F. Supp. 3d 841, 845 (D. Md. 2015). So too where the perception is of national origin rather than religion: an Indian employee harassed as "Arab" and "Taliban" states a national-origin claim though his harassers misidentified his actual origin entirely. *EEOC v. WC&M Enterprises, Inc.*, 496 F.3d 393, 401 (5th Cir. 2007). Even where the association is real rather than assumed, the same principle controls: an employer who disapproves of an employee's actual marriage across racial lines discriminates against the employee "because of the employee's own race." *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008) (citing *Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996)). Each of these lines of authority, like § 1985(3), defines the wrong by the discriminator's reasoning, not the victim's provable, private reality. The district court offered no principled reason why § 1985(3) alone should be the

exception, when the complaint's own allegations, FAC ¶¶ 101–102, 133, 159, 173, satisfy that standard under either line of cases.

The court's amorphousness objection dissolves once perception is put in its proper causal place. Its hypothetical, the secret antisemite swept into the class merely for getting in the Occupiers' way, Op. at *16, answers itself: a man attacked for reasons unconnected to anti-Jewish animus has no claim no matter what he was called, and a man beaten while a mob chants "Jew-lover" has pleaded the connection in the defendants' own voices.

Nor does *Bray's* admonition that a class "unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors," 506 U.S. at 269, carry the weight the opinion places on it. *Bray* condemned a conduct-defined class, women seeking abortion, precisely because the conduct and the class were separable. *Bray* itself supplies the counter-example: "a tax on wearing yarmulkes is a tax on Jews," because the two cannot be pulled apart. 506 U.S. at 270. Justice Stevens's dissent took the point further still: conduct inseparable from a protected class is itself class-based targeting, whatever label a court gives the conduct. *Id.* at 344 n.20, 345 n.23 (Stevens, J., dissenting).

Torres and Wilson's alleged offense, refusing to vacate a building on the conspirators' terms while being called "Jew-lover" for it, FAC ¶¶ 159, 173, is not separable from the class the conspirators invoked to explain it. It was the district

court, not the plaintiffs, that substituted a conduct class, recasting the pleaded class as people whose only common trait is that "they got in the Occupiers' way," Op. at *16, and then holding its own substitute not cognizable. *Bray* condemns that reformulation, not the class the plaintiffs pleaded.

One more feature of the opinion deserves this Court's attention. In footnote 3, the district court concedes that neither of the sister-court decisions structuring its analysis, *StandWithUs* and *Weinberg*, "considered whether supporters or perceived supporters of Jews constituted a cognizable class." Op. at *9 n.3. The cognizability holding thus rests on no authority addressing the question, sustained only by the court's statement that it is aware of none. Several are now before this Court. *Waller* sustained claims by plaintiffs "identifiable in the defendants' eyes as members of a class of advocates of equal rights for black people." 584 F. Supp. at 937. *Sines* sustained claims by non-minority plaintiffs "attacked because of their support of non-white racial minorities." 324 F. Supp. 3d at 780–81. And *Pisello* allowed a white plaintiff to sue for a conspiracy aimed at his placement of minority families in housing. 933 F. Supp. at 216. Each builds on *Griffin's* recognition that attackers' perceptions of their victims are evidence of class-based animus. See 403 U.S. at 103.

**IV. The opinion's three holdings are one error stated three times, and the opinion cannot keep them apart.**

The dismissal presents itself as three independent grounds: no conscious objective, no direction at the pleaded class, no cognizable class. Each holding borrows its conclusion from the others, and each rests on an inference this Court, reviewing de novo, must draw for the plaintiffs rather than against them. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

Holding One assumes that the FAC pleads a single, exclusive conspiratorial objective, seizing Hamilton Hall, to the exclusion of any other. That assumption is not stated in the complaint; it is manufactured by reducing the mob to "one unnamed protester," Op. at *12 n.5, in defiance of the opinion's own fact section, Op. at *5, and by treating the employee-contingency planning as a mere "side effect" rather than a second, coexisting object. Op. at *9.

Holding Two depends on the same assumption. It reads "as well as anyone who might stand in their way" to delete the words that precede it, Op. at *14, but that reading is only available if the court has already decided, per Holding One, that the conspiracy could have had only one object in the first place. *See supra* Section II. A conspiracy free to pursue two objects at once has no need to choose between "perceived Jews and their supporters" and "anyone who got in their way." Op. at *11, *14.

Holding Three also depends on this "single objective" fallacy. The court held that "people who are or are perceived to be Jews or supporters of Jews" is not a

cognizable class, Op. at *16, but that holding, *see supra* Section III, rests on the same premise: that Torres and Wilson's detention and victimization in Hamilton Hall can be explained by only one cause, their employment, and not by a second, coexisting cause, their perceived alignment with Jews.

Correct the first two holdings and the floor falls out beneath the third, because the cognizability holding, which purports to be about the abstract definition of a class, is resolved on this case's membership facts: the class fails, the court says, because "[t]he only thing that the members of the proposed class have in common is that they got in the Occupiers' way." Op. at *16. Whether these two plaintiffs plausibly fit a class is a different question from whether the class exists, and disposing of the first by the second is not analysis. Strip out the borrowed conclusions and a single proposition remains: that announced political demands immunize the discriminatory violence used to press them. The text of § 1985(3), the history of the Klan Act, and *Bray* itself all say otherwise. The court called what happened to these two men "despicable" and their attackers' words "ugly," Op. at *11, *14, and then held that federal civil rights law has nothing to say about it. The state tort system can compensate Torres and Wilson for their injuries, but it cannot name what was done to them, and naming it is what this statute is for.

## CONCLUSION

The judgment should be reversed, and the case remanded for further proceedings.

Respectfully submitted,

/s/ Mark Goldfeder
Mark Goldfeder
David Benger
NATIONAL JEWISH ADVOCACY CENTER
1954 Airport Rd., Suite 1196
Atlanta, GA 30341
(332) 278-1100
Mark@NJACLaw.org
David@NJACLaw.org

Counsel for Amicus Curiae
The National Jewish Advocacy Center

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(a)(5) and Second Circuit Local Rule 29.1(c) because it contains 6,130 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type-style requirements of Rule 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using Microsoft Word.

/s/ Mark Goldfeder
Mark Goldfeder
Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system, which will send notice of such filing to all counsel of record.

/s/ Mark Goldfeder
Mark Goldfeder
Counsel for Amicus Curiae